43 F.3d 265
 96 Ed. Law Rep. 389
 Lorie Ann HORNER; Jennifer Baker; Juliane Brown; Leslie
Burgett; Angela Chaffin; Tracy Dotson; Jacqueline Elston;
Amy Hacker; Elizabeth Suzanne Hartlage; Kelly Johnson;
Barrie Wagers; and Mary Christine Whitelock, by and through
their next friends, Plaintiffs-Appellants,
v.
KENTUCKY HIGH SCHOOL ATHLETIC ASSOCIATION and Kentucky State
Board for Elementary and Secondary Education,
Defendants-Appellees.
 No. 93-5191.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 14, 1994.
Decided Dec. 22, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied March
10, 1995.
 
 1
 Donald E. Armstrong, Jr. (argued and briefed), Smith & Armstrong, Louisville, KY, for plaintiffs-appellants.
 
 
 2
 Danny C. Reeves (argued and briefed), Phillip Scott, Kenneth A. Jackson, Greenebaum, Doll & McDonald, Lexington, KY, for Kentucky High School Athletic Ass'n.
 
 
 3
 Robert E. Stopher (briefed), Palmer G. Vance, II, Patricia G. Tobin, Boehl, Stopher & Graves, Louisville, KY, for Kentucky State Bd. for Elementary and Secondary Educ.
 
 
 4
 Before: KEITH and BATCHELDER, Circuit Judges; and JOINER, District Judge.*
 
 
 5
 JOINER, District Judge, delivered the opinion of the court, in which KEITH, District Judge, joined. BATCHELDER, Circuit Judge (pp. 276-77), delivered a separate opinion dissenting in part.
 
 
 6
 JOINER, District Judge.
 
 
 7
 Plaintiffs are twelve female student athletes who participate in interscholastic girls' high school slow-pitch softball in Kentucky. Plaintiffs contend that defendants, the Kentucky State Board of Education for Elementary and Secondary Education and the Kentucky High School Athletic Association, discriminated against them on the basis of sex by sanctioning fewer sports for girls than for boys and by refusing to sanction girls' interscholastic fast-pitch softball. Plaintiffs' complaint asserted claims under the Equal Protection Clause; Title IX of the Education Amendments of 1972, as amended by the Civil Rights Restoration Act of 1987 (20 U.S.C. Secs. 1681-1688); and state law. The district court concluded that plaintiffs were not denied equal athletic opportunity, and granted summary judgment for defendants on plaintiffs' constitutional and Title IX claims. We conclude that genuine issues of material fact preclude the entry of summary judgment on the Title IX claim, but affirm the entry of summary judgment on plaintiffs' equal protection claim.
 
 I.
 
 8
 We review the entry of summary judgment de novo, assessing the record in the light most favorable to plaintiffs, and drawing all reasonable inferences in their favor. Klepper v. First Am. Bank, 916 F.2d 337, 341 (6th Cir.1990).
 
 A.
 Defendants
 
 9
 The primary function of the Kentucky State Board for Elementary and Secondary Education is to "develop and adopt policies and administrative regulations by which the Department of Education shall be governed in planning, coordinating, administering, supervising, operating, and evaluating the educational programs, services and activities within the Department of Education which are within the jurisdiction of the board." Ky.Stat.Ann. Sec. 156.029(7) (Baldwin 1990). The Board has the exclusive management and control of all the common schools in Kentucky and all of the programs operated in the schools, including interscholastic athletics. Sec. 156.070(1). Pursuant to statute, the Board is allowed to delegate its responsibility to manage and control interscholastic athletic programs to an agent. Sec. 156.070(2).
 
 
 10
 The Kentucky High School Athletic Association (KHSAA) is designated by regulation as the Board's "agent to manage interscholastic athletics at the high school level in the common schools, including any private schools desiring to associate with KHSAA and to compete with the common schools." 702 Ky.Admin.Regs. Sec. 7:065(1) (1993). The KHSAA is a voluntary, self-managing, unincorporated association of public, private and parochial schools. The member schools pay dues, and are required to comply with the KHSAA's constitution, by-laws, policies, and procedures. The KHSAA's board of control consists of twelve persons elected to four-year terms by representatives of the member schools.
 
 Sanctioning of a Sport
 
 11
 A number of interscholastic sports are "sanctioned" by the KHSAA, meaning that the KHSAA will recognize and sponsor a state tournament in the sport. Pursuant to the decision of the board of control, a new sport will not be sanctioned unless at least 25 percent of the member schools indicate a willingness to participate. A sport must have 15 percent participation to continue its sanctioned status. The KHSAA states that this policy is due to limited resources; the association is not able to sponsor a state tournament in all sports in which there is some student interest. The KHSAA does not explain why 25 percent interest is necessary to sanction a new sport if only 15 percent participation is sufficient to maintain a sanctioned sport.
 
 
 12
 The KHSAA does not prohibit member schools from participating or competing in non-sanctioned sports. Additionally, the association does not prohibit girls from playing on boys' teams in sanctioned sports if the member school does not provide a girls' team. The record does not indicate whether the lack of these affirmative prohibitions has translated into a real opportunity for girls; i.e., whether girls desiring to compete outside the auspices of the KHSAA actually have been able to do so, and whether girls have a meaningful opportunity to play and compete on boys' teams.
 
 
 13
 At the time the lawsuit was filed, the KHSAA sanctioned 18 sports, 10 for boys and 8 for girls.[1] Girls' slow-pitch softball was first sanctioned in 1982, following a survey in which 44 percent of the member schools indicated they would participate. In 1988, a survey was conducted regarding girls' fast-pitch softball, and 26 schools, approximately 9 percent, indicated they would participate. A second survey was conducted in 1992, and 50 schools, approximately 17 percent, indicated they would participate. The record does not reflect whether female athletes at the member schools were polled or otherwise consulted before the schools responded, or failed to respond, to the survey. The KHSAA refused to sanction the sport because 25 percent of the schools did not indicate a willingness to participate.
 
 The Importance of Fast-Pitch Softball
 
 14
 The KHSAA sanctions boys' baseball, but not what plaintiffs claim is the practical equivalent for girls, fast-pitch softball. In all sports sanctioned by the KHSAA save one, the participants are taught the skills necessary for them to have the opportunity to compete for college athletic scholarships. The exception is slow-pitch softball. Although slow-pitch softball embodies some of the same rudimentary skills of baseball, it is significantly different from fast-pitch softball in its rules and regulations and in the physical and mental skills required.
 
 
 15
 Plaintiffs assert, and defendants do not dispute, that 1,133 schools in the National Collegiate Athletic Association, the National Association of Intercollegiate Athletics, and the National Junior College Athletic Association sanction fast-pitch softball. Many of the schools offer scholarship assistance to softball players. The NCAA and the NAIA do not sanction slow-pitch softball, and only 49 schools in the NJCAA play slow-pitch softball, while 215 play fast-pitch. Kentucky's female softball players are at a disadvantage when competing for college athletic scholarships.Funding
 
 
 16
 The KHSAA is funded primarily by profits derived from football playoffs and the state basketball tournament. The KHSAA does not receive direct federal financial assistance, but does receive a portion of its revenues from dues paid by member schools. Neither defendant contests plaintiffs' assertion that most of the member schools in the KHSAA are public high schools which receive federal funds.
 
 
 17
 The Board receives funds solely from the Kentucky General Assembly. The General Assembly appropriates money to the Kentucky Department of Education, from which an allotment is made to the Board. The Board did not directly receive financial assistance from the federal government or any of its agencies at any time relevant to the suit.
 
 
 18
 The Board does not dispute that the Kentucky Department of Education receives $396 million in federal funds for education assistance and specified programs. Pursuant to statute, the Department of Education is the sole state agency charged with developing and approving state plans required for receiving federal funds. Ky.Rev.Stat.Ann. Sec. 156.010(11). The Board is authorized to implement the provisions of any act of Congress appropriating funds to the state, Sec. 156.035(2), and has exercised this authority with respect to a number of federal financial assistance programs.[2]
 
 B.
 
 19
 Plaintiffs filed suit in June 1992, contending that defendants violated Title IX, the Equal Protection Clause, and state law by sanctioning fewer sports for girls than for boys, thus affording unequal athletic opportunity, and by refusing to sanction fast-pitch softball, with the result that plaintiffs are disadvantaged in their ability to compete for and obtain college scholarships.[3] Defendants filed motions to dismiss or for summary judgment based on a number of grounds, including arguments that they did not violate Title IX or the Equal Protection Clause, and that they were not "recipients" of federal funds and thus not subject to Title IX. The district court agreed that plaintiffs' Title IX and constitutional rights were not violated, and thus found it unnecessary to reach the other issues presented.
 
 
 20
 The court dismissed plaintiffs' equal protection claim, noting that the Equal Protection Clause comes into play only when a classification treats similarly situated persons in different ways, and implying that females are not treated differently because the KHSAA does not prohibit them from trying out for boys' teams and does not prohibit member schools from fielding teams in nonsanctioned sports. Relying on cases rejecting claims that student athletes have a due process right to participate in sports, the court concluded that the plaintiffs' interest in competing for college athletic scholarships did not rise to constitutional significance. Finally, the court found KHSAA's justification for its refusal to sanction fast-pitch softball, the 25 percent rule, to be gender-neutral and to reflect the schools' lack of interest in the sport.
 
 
 21
 With respect to defendants' alleged Title IX liability, the court held that there was no independent obligation to provide a team for girls simply because a team was supplied for boys, relying on a Title IX regulation which states that when a team is supplied for one gender, "members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport[.]" 34 C.F.R. Sec. 106.41(b). The court stated that while the regulations instruct that recipients of federal funds must provide equal athletic opportunities, a number of factors are to be considered, including whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes. The court held that the evidence presented failed to raise a sufficient question that girls were denied equal athletic opportunity because they can compete on boys' baseball teams and in a sanctioned slow-pitch league. "Thus, the evidence shows that the current program offers females an unrestricted opportunity to compete, and a choice of competitive level based on the interests of the member schools." Having concluded that plaintiffs' federal claims lacked merit, the court exercised its discretion to dismiss the state law claims without prejudice.
 
 II. Title IX
 
 22
 A. Whether Defendants are Subject to Title IX
 
 
 23
 Both defendants claim that they are not recipients of federal financial aid, and thus are not subject to Title IX. The district court found it unnecessary to reach this question, but defendants urge us to affirm the court's entry of summary judgment on this ground. We decline to do so.
 
 
 24
 Title IX prohibits sex discrimination under any education program or activity receiving federal funds. 20 U.S.C. Sec. 1681(a). Pursuant to regulation, "recipient" is defined as:
 
 
 25
 any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.
 
 
 26
 34 C.F.R. Sec. 106.2(h).
 
 
 27
 Prior to its amendment in 1987 by the Civil Rights Restoration Act, Title IX was construed as being program-specific, and not providing institution-wide coverage. Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In response to that construction, Congress amended Title IX by adding Sec. 1687, entitled "Interpretation of 'program or activity.' "
 
 
 28
 For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of--
 
 
 29
 (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
 
 
 30
 (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
 
 
 31
 (2)(A) ....
 
 
 32
 (B) a local educational agency, system of vocational education, or other school system;
 
 
 33
 ....
 
 
 34
 any part of which is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.
 
 
 35
 20 U.S.C. Sec. 1687 (footnote omitted; citation omitted; emphasis added).
 
 
 36
 The legislative history describes the effect of the amendments, stating that the definitions of "program or activity" and "program" "make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." S.Rep. No. 64, 100th Cong., 2d Sess. 4, reprinted in 1988 U.S.C.C.A.N. 3, 6. The amendment has been construed consistently with this intent. Williams v. School Dist. of Bethlehem, 998 F.2d 168, 171 n. 3 (3d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994); Cohen v. Brown Univ., 991 F.2d 888, 894 (1st Cir.1993).
 
 
 37
 If facts are proved consistent with plaintiffs' opposition to the Board's motion for summary judgment, we would have no difficulty concluding that the Board is a "recipient" of federal financial assistance and thus subject to Title IX. The Board does not dispute that the Kentucky Department of Education receives over $396 million in federal funds. Pursuant to state statute, the Board controls and manages, on behalf of the Department, the state's schools and all programs conducted in the schools. While the federal funds may flow into and out of the Department, the Board's position at the Department's helm cannot be ignored. As noted, the Board has the statutory authority to implement the provisions of federal statutes appropriating funds to the state, and has exercised this authority with respect to a number of federal financial assistance programs. We therefore decline the Board's invitation to decide this case in accordance with form rather than substance, and hold that it was not entitled to summary judgment on the ground that it is not a recipient of federal funds.
 
 
 38
 The status of the KHSAA presents a closer question, but we conclude here as well that the association was not entitled to summary judgment on its claim that it is not a recipient of federal funds within the meaning and intent of Title IX. The most persuasive evidence of the KHSAA's status as a recipient is the fact that its functions are statutorily decreed to be those of the Board. The association is able to perform those functions because state law expressly permits the Board to designate an agent to manage interscholastic athletics. Ky.Rev.Stat.Ann. Sec. 156.070(1), (2). This, in combination with the fact that the KHSAA receives dues from member schools which do receive federal funds,[4] indicates that the association qualifies as an "agent" which indirectly receives federal funds as described in 34 C.F.R. Sec. 106.2(h), and is thus subject to Title IX. Grove City College, 465 U.S. at 564-70, 104 S.Ct. at 1216-20 (perceived distinction between direct and indirect aid finds no support in Title IX; college indirect recipient of federal funds through educational grants given to its students).[5]
 
 
 39
 Congress has made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs. We will not defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution. Simply put, it appears that Kentucky's school system receives substantial federal financial assistance. The Board runs the schools, and the KHSAA, apparently funded in part through dues paid by the state's public schools, performs the Board's statutory functions with respect to interscholastic athletics. On these facts, both defendants would be subject to Title IX. We therefore reject defendants' arguments that they were entitled to entry of summary judgment on this issue, and remand this case for proceedings consistent with this opinion.
 
 B. Equal Athletic Opportunity Mandate
 
 40
 Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. Sec. 1681(a). We must determine whether the record supports the district court's conclusion that defendants complied with Title IX's equal athletic opportunity mandate. We are significantly aided in our analysis of this question by the thorough discussion of similar issues in recent cases from our sister circuits, all issued after the district court's decision in this case. Roberts v. Colorado State Bd. of Agric., 998 F.2d 824 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993); Williams v. School Dist. of Bethlehem, 998 F.2d 168 (3d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994); Cohen v. Brown Univ., 991 F.2d 888 (1st Cir.1993).
 
 
 41
 After the enactment of Title IX, the Department of Health, Education and Welfare promulgated regulations implementing the statute's nondiscrimination requirements, and these regulations were replicated by the Department of Education at 34 C.F.R. Sec. 106. As recognized by the district court, the regulations do not impose an independent requirement that an institution always sponsor separate teams for each sport it sanctions. 34 C.F.R. Sec. 106.41(b). However, the regulations do require that institutions provide gender-blind equality of athletic opportunity to its students. 34 C.F.R. Sec. 106.41(c). An institution's compliance with this requirement is determined with reference to a number of factors, including "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes[.]" 34 C.F.R. Sec. 106.41(c)(1). An institution "may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes." Roberts, 998 F.2d at 828.
 
 
 42
 In assessing whether an institution has met its effective accommodation obligations, reference must be made to the Policy Interpretation originally issued by the Department of Health, Education and Welfare in 1979. Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed.Reg. 71,413 (Dec. 11, 1979). The Policy Interpretation states that its general principles will often apply to interscholastic athletic programs, and has been held to apply to such programs. Id. at 71,413; Williams, 998 F.2d at 171. The Policy Interpretation is a "considered interpretation" of the applicable regulations, and is entitled to substantial deference by the courts.[6] Cohen, 991 F.2d at 896-97; Williams, 998 F.2d at 171.
 
 
 43
 To satisfy 34 C.F.R. Sec. 106.41(c)(1), an institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity. Policy Interpretation, Section VII.C.1., 44 Fed.Reg. at 71,417. With respect to the manner in which the interest of the students is to be determined, the Policy Interpretation instructs that the methods chosen by the institution must be nondiscriminatory and must not disadvantage members of an underrepresented sex. Policy Interpretation, Section VII.C.3., 44 Fed.Reg. at 71,417.
 
 
 44
 The district court found that plaintiffs have an unrestricted opportunity to compete based upon the interests of the member schools. However, the interests of the member schools is not necessarily identical with that of the students, a question on which the record is completely silent. At best, the record reflects that 17 percent of the member schools were interested in having fast-pitch softball sanctioned. The interest of female students at the other schools is unknown, because there is no information regarding whether the member schools polled their students before responding, or failing to respond, to the KHSAA's survey. Moreover, while reliance on the interest of the member schools in adding a sanctioned sport may appear to be gender-neutral, it is a method which has great potential for perpetuating gender-based discrimination. Under the district court's reasoning, a school system's compliance with Title IX can be measured by the personal views of the administrators of individual schools, irrespective of whether these views achieve Title IX's equal opportunity requirement.[7]
 
 
 45
 Regarding the selection of sports, the Policy Interpretation instructs:
 
 
 46
 b. Non-Contact Sports--Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it must do so for members of the other sex under the following circumstances:
 
 
 47
 (1) The opportunities for members of the excluded sex have historically been limited;
 
 
 48
 (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and
 
 
 49
 (3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected.
 
 
 50
 Policy Interpretation, Section VII.C.4.b., 44 Fed.Reg. at 71,418. With respect to subsection (1), there is evidence in the record that the opportunities for girls were, and are, more limited than those for boys. With respect to subsection (2), the level of interest of all high school girls in fast-pitch softball is unknown. With respect to subsection (3), the record reflects only that girls are not prohibited from playing on the boys' baseball teams. The record does not disclose whether and to what extent girls actually play. See Williams, 998 F.2d at 175 ("The mere opportunity to try out for a team ... is not determinative of the question of 'previously limited' athletic opportunities under title IX. 'Athletic opportunities' means real opportunities, not illusory ones.").
 
 
 51
 Finally, with respect to assessing whether an institution effectively accommodates the interest of students in the selection of the levels of competition, the Policy Interpretation states:
 
 
 52
 In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.
 
 
 53
 a. Compliance will be assessed in any one of the following ways:
 
 
 54
 (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
 
 
 55
 (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex;
 
 
 56
 (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.
 
 
 57
 Policy Interpretation, Section VII.C.5.a., 44 Fed.Reg. at 71,418 (emphasis added). See also Section VII.C.5.b. The Policy Interpretation's reading of the regulation draws its essence from the statute and stands upon a "plausible, if not inevitable, reading of Title IX," and is thus entitled to enforcement. Cohen, 991 F.2d at 899.
 
 
 58
 The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity.[8] Roberts, 998 F.2d at 828; Cohen, 991 F.2d at 901. Substantial proportionality provides a safe harbor for recipients of federal funds. "Thus, a university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." Cohen, 991 F.2d at 897-98. Accord Roberts, 998 F.2d at 829. If the plaintiffs prove disparity, then the institution must show that it satisfies subsection (2). If it fails here, the plaintiffs may prevail by sustaining their burden of proof under subsection (3) and demonstrating an unmet interest on the part of the underrepresented sex. Roberts, 998 F.2d at 830-31; Cohen, 991 F.2d at 901. Subsection (3) " 'sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.' " Roberts, 998 F.2d at 831-32 (quoting Cohen, 991 F.2d at 898).[9]
 
 
 59
 Thus, if female students are statistically underrepresented in athletics, their interests must be fully accommodated unless the institution in question can satisfy its burden of demonstrating a history and continuing practice of program expansion. An institution need not pour ever-increasing sums into its athletic programs in order to bring itself into compliance, but has the option of reducing opportunities for the overrepresented gender while keeping opportunities for the underrepresented gender stable. Cohen, 991 F.2d at 898-99 n. 15. Thus, a recipient may not simply plead limited resources to excuse the fact that there are fewer opportunities for girls than for boys.
 
 
 60
 It is evident that genuine issues of material fact abound in this case, and preclude any determination that defendants have complied with Title IX's equal athletic opportunity mandate. We therefore reverse the district court's entry of summary judgment on plaintiffs' Title IX claims.[10]
 
 III. Equal Protection Claim
 
 61
 Plaintiffs do not claim to have a constitutional right to participate in interscholastic athletics.[11] Rather, they challenge the disparate impact of the KHSAA's concededly neutral 25 percent rule, claiming that the rule disproportionately and adversely affects young women by reducing their athletic opportunities, in terms of both the number and kind of sports sanctioned by the KHSAA.
 
 
 62
 The Equal Protection Clause forbids only intentional discrimination. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When a facially neutral rule is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated or reaffirmed because of, not merely in spite of, its adverse impact on persons in the plaintiff's class. Personnel Adm'r v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). " 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences." Id. The necessary showing of intent may be made in a variety of ways. See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-68, 97 S.Ct. 555, 562-65, 50 L.Ed.2d 450 (1977). Disproportionate impact, though not irrelevant, "is not the sole touchstone of ... discrimination." Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
 
 
 63
 Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action--whether it "bears more heavily on one race than another,"--may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare.
 
 
 64
 Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 564 (citations and footnote omitted). The Court has made clear that the type of impact sufficient in itself to prove intentional discrimination is that which is significant, stark, and unexplainable on other grounds. Id. (citing Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (boundary change to city, eliminating all but five of 400 black voters from city); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (ordinance enforced against laundries owned by Chinese citizens)).
 
 
 65
 Plaintiffs did not allege that defendants adopted or adhered to the 25 percent rule because of rather than in spite of its disparate impact on females. Nor did they come forward with evidence of discriminatory intent, such as a tainted historical background of the rule, or a circumstantially suspicious sequence of events leading up to the rule. See Arlington Heights, 429 U.S. at 267-68, 97 S.Ct. at 564-65. In short, plaintiffs claimed only that sheer disparate impact was sufficient to demonstrate an equal protection violation. This simply was not enough to defeat the defendants' motion for summary judgment. Accordingly, we affirm that aspect of the court's ruling.
 
 
 66
 We REVERSE the judgment against plaintiffs on their Title IX claim, and AFFIRM the judgment against plaintiffs on their equal protection claim, and REMAND for further proceedings consistent with this opinion.
 
 
 67
 BATCHELDER, Circuit Judge, dissenting in part.
 
 
 68
 The majority affirms the grant of summary judgment on the equal protection claim but reverses the grant of summary judgment on the Title IX claim. I agree that the plaintiffs did not describe a wrong of constitutional magnitude, but because I think the plaintiffs in this case did not present a prima facie case of a Title IX violation, I respectfully dissent.
 
 
 69
 Throughout the majority opinion appear comments on the absence of evidence in the record on pivotal issues. For example, on the issue of statistical disparity between student population and student participation in athletics, the majority writes, "Although the record is silent on this point, the court was informed at oral argument that 33,891 boys (65 percent) participate in sanctioned sports in Kentucky, while only 18,860 girls (34.8 percent) participate." See maj. op. at 275 n. 8. On the issue of whether there exists an unmet interest in participation among the underrepresented sex, the majority states that "the level of interest of all high school girls in fast-pitch softball is unknown," impliedly because KHSAA distributed its survey to member schools without requiring polling of female students. Maj. op. at 274; see also maj. op. at 273.
 
 
 70
 In these comments and others, the majority necessarily concedes that the plaintiffs failed to sustain their burden of proof under Title IX. Title IX, when read with the implementing regulation and the policy interpretation, places the burden of proving statistical disparity and unmet interest squarely on the shoulders of the plaintiffs. Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 829 n. 5, 831 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993); Cohen v. Brown Univ., 991 F.2d 888, 901-02 (1st Cir.1993). The record is silent or otherwise inadequate on the issues upon which the plaintiffs' case depends, and recitation of statistics at oral argument cannot cure the plaintiffs' earlier neglect. The district court's grant of summary judgment on the Title IX claim should be affirmed.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Boys' sports were basketball, baseball, cross country, football, golf, soccer, swimming, tennis, track and wrestling. Girls' sports were basketball, cross country, golf, slow-pitch softball, swimming, tennis, track and volleyball
 
 
 [2]
 E.g., 702 Ky.Admin.Regs. Sec. 6:010 (federal assistance for school lunches under 42 U.S.C. Secs. 1751 et seq. and 42 U.S.C. Secs. 1771 et seq.); 704 Ky.Admin.Regs. Sec. 3:292 (migrant education federal grant requirements of 42 U.S.C. Secs. 2701 et seq. and Secs. 2781-2783); 704 Ky.Admin.Regs. Sec. 3:335 (federal funds received under Chapter 2 of Elementary and Secondary School Improvement Amendments of 1988, 20 U.S.C. Secs. 2911-2976); 704 Ky.Admin.Regs. Sec. 7:090 (Homeless Assistance Act Amendments of 1990, 42 U.S.C. Sec. 11432, funds for homeless children education programs); 707 Ky.Admin.Regs. Sec. 1:015 (Policies and procedures for use of Education of the Handicapped Act, Part B, funds, 20 U.S.C. Secs. 1400 et seq.)
 
 
 [3]
 Plaintiffs' request for class action certification was provisionally denied pending discovery, and it appears that defendants' motions to dismiss were filed and granted before this issue could be revisited
 
 
 [4]
 These facts distinguish the KHSAA from its Ohio counterpart, as described in Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association, 647 F.2d 651, 653, 656 (6th Cir.1981) (indicating OHSAA not "recipient" of federal funds)
 
 
 [5]
 The Supreme Court distinguished Grove City College in United States Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), and held that commercial airlines did not qualify as "recipients" of federal funds under Sec. 504 of the Rehabilitation Act of 1979, 29 U.S.C. Sec. 794, because they benefited from federal financial assistance granted to airports and because their operations were inextricably intertwined with those of airports. Unlike the commercial airlines in that case, the KHSAA here performs the statutory duties of a recipient of federal funds, and directly receives income in the form of dues from schools that receive federal funds. Its status thus goes beyond that of an indirect beneficiary of federal financial assistance
 
 
 [6]
 In Cohen, the court held that the Policy Interpretation would be viewed as having been adopted by the Department of Education, although there was no record that the agency formally did so, because the agency adopted the very same regulation which the Policy Interpretation was issued to interpret, "sending an unmistakably clear signal of the agency's satisfaction with the Policy Interpretation." 991 F.2d at 896 n. 10
 
 
 [7]
 Reliance on the KHSAA's 25 percent rule does not provide a safe harbor for the Board, as is evident from 34 C.F.R. Sec. 106.6(c):
 Effect of rules or regulations of private organizations. The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives or benefits from Federal financial assistance.
 This regulation and 702 Ky.Admin.Reg. Sec. 7:065 (pursuant to which the Board adopts KHSAA's constitution, by-laws, procedures and rules), refutes the Board's claim in part C of its brief that it cannot be liable to plaintiffs because the KHSAA has "exclusive control" of high school athletics, and/or acted outside the scope of the Board's delegation of power to the association.
 
 
 [8]
 Although the record is silent on this point, the court was informed at oral argument that 33,891 boys (65 percent) participate in sanctioned sports in Kentucky, while only 18,860 girls (34.8 percent) participate
 
 
 [9]
 In assessing an institution's compliance with subsection (3), i.e., that it fully and effectively accommodate the interests of the underrepresented sex, both the First and the Tenth Circuits have rejected the proposition that a recipient need only accommodate females to the extent that it accommodates males, or, stated differently, that an institution need only allocate athletic opportunities to women in accordance with the ratio of interested and able women to interested and able men. This argument reads the "full" out of "fully and effectively." Cohen, 991 F.2d at 899
 While the institution's burden under subsection (3) is an exacting one, an institution is not required to field a team in response to, e.g., the pleas of "one talented softball player," if sufficient numbers of individuals to form teams to compete do not exist. See Roberts, 998 F.2d at 831 n. 10; Cohen, 991 F.2d at 898. In this case, it appears that 17 percent of the schools are prepared to field fast-pitch softball teams, an adequate number to maintain a sport under the existing regulations.
 
 
 [10]
 After oral argument, and as part of a petition for rehearing, the court was informed for the first time that the Kentucky General Assembly enacted Ky.Rev.Stat. Sec. 156.070(2)(a) (effective July 15, 1994), in response to which the KHSAA adopted by-law 40. Both of these developments may have an impact on the ultimate solution of the problems presented in this case, and are matters to be considered by the trial court on remand
 
 
 [11]
 Burrows v. Ohio High Sch. Athletic Ass'n, 891 F.2d 122, 125-26 (6th Cir.1989); Hamilton v. Tennessee Secondary Sch. Athletic Ass'n, 552 F.2d 681, 682 (6th Cir.1976)