Veronica OLLIER, et al., Plaintiffs,

v.

**SWEETWATER UNION HIGH SCHOOL DISTRICT, et al., Defendants.**

**Civil No. 07cv714–L(WMc).**

United States District Court, S.D. California.

March 30, 2009.

Elizabeth Kristen, Legal Aid Soc–Emp Law Ctr., San Francisco, CA, Erin Cranman Witkow, Manatt Phelps and Phillips, Los Angeles, CA, for Plaintiffs.

Daniel R. Shinoff, Gil Abed, Patricia Michelle Coady, Stutz Artiano Shinoff and Holtz, San Diego, CA, for Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION [doc. # 66]

M. JAMES LORENZ, District Judge.

Plaintiffs move for partial summary judgment on their second cause of action. [doc. # 66]. The motion has been thoroughly briefed and the Court finds this matter suitable for determination on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons set forth below, the Court grants plaintiffs' motion.

### I. Background

Plaintiffs are female students who attend or will attend Castle Park High School ("CPHS") in the Sweetwater Union School District ("District") and participate or would participate in interscholastic athletic activities. On April 19, 2007, named plaintiffs brought this case as a class action.[1]

Defendants are alleged to have unlawfully discriminated against female student

---

1. The Court granted plaintiffs' motion for class certification on August 25, 2008, 251 F.R.D. 564. [doc. # 71] The certified class includes "[a]ll present and future CPHS female students and potential students who participate, seek to participate, and/or are or were deterred from athletics at CPHS." *Id.* at 565.

athletes with respect to "practice and competitive facilities; locker rooms; training facilities; equipment and supplies; travel and transportation, coaches and coaching facilities; scheduling of games and practice times; publicity; and funding." (Complaint, ¶ 40.) Additionally, plaintiffs allege that defendants have "failed to provide female students with equal athletic participation opportunities, despite their demonstrated athletic interest and and abilities to participate in athletics." *Id.,* ¶ 71. Because of this alleged failure, plaintiffs assert that girls' participation in sports is severely limited and interested girls are discouraged from going out for sports. *Id.,* ¶ 74.

Defendants [2] filed their answer on June 29, 2007 [doc. # 14] which included 31 affirmative defenses. In their present motion, plaintiffs seek summary adjudication of their second cause of action and 21 of the 31 affirmative defenses raised by defendants: 9, 10, 11, 13, 16, 19–31. In response to plaintiffs' motion, defendants state that "the District does not have evidence to support the affirmative defenses challenged in this motion, and therefore agrees to dismiss these particular affirmative defenses." (Opp. at 17.)

## II. Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 empowers the court to enter summary judgment on factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(c). A fact is material when, under the substantive governing law, it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party does not have the burden of proof at trial, it may carry its initial burden by "produc[ing] evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir.2000). When the moving party bears the burden of proof on an issue—whether on a claim for relief or an affirmative defense—the party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in its favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986); *see S. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party fails to discharge its initial burden of production, summary judgment must be denied and the court need not consider the nonmoving party's evidence, even if the nonmoving party bears the burden of persuasion at trial. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Nissan Fire,* 210 F.3d at 1102–03. When the moving party carries its initial burden of production, the nonmoving party

---

**2.** Defendants include the District and individual defendants Arlie N. Ricasa, Pearl Quinones, Jim Cartmill, Jaime Mercado, Greg R. Sandoval, Jesus M. Gandara, Earl Weins and Russell Moore (collectively "defendants").

cannot "rest upon mere allegation or denials of his pleading." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the non-movant must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (internal quotations omitted); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Nissan Fire*, 210 F.3d at 1103.

A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). When ruling on a summary judgment motion, the court cannot engage in credibility determinations or weighing of the evidence; these are functions for the jury. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir.2002). The court must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1180 (9th Cir.2002), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003). The court is not required "to scour the record in search of a genuine issue of triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir.2001).

## III. Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs' second cause of action alleges a violation of Title IX based upon unequal participation opportunities for females in athletic programs at CPHS against defendant District.[3]

The Office of Civil Rights ("OCR") published a Policy Interpretation of Title IX in 1979, that laid out the three factors used to assess whether an institution complies with Title IX. *See* OCR Policy Interpretation, 44 Fed.Reg. 71,413 (1979); *see also Neal v. Bd. of Trustees of Cal. State Universities*, 198 F.3d 763, 767 (9th Cir.1999).

In the present case, the parties agree that compliance in the area of equivalent participation opportunities must be determined by the three-part test:

1. Whether intercollegiate[4] level participation opportunities for male and female students are provided in

---

**3.** Plaintiffs' complaint alleges four causes of action: first cause of action: violation of Title IX of the Education Amendments of 1972—unequal treatment and benefits in athletic programs against defendant Sweetwater School District; second cause of action: violation of Title IX—unequal participation opportunities in athletic programs against defendant Sweetwater Union School District; third cause of action: violation of Title IX—

retaliation against Sweetwater School District; and fourth cause of action: 42 U.S.C. § 1983, sex-based discrimination in violation of the fourteenth amendment against the individual defendants in their official capacities. Plaintiffs' motion for summary adjudication is directed to the second cause of action only.

**4.** The Policy Interpretation reference to "intercollegiate" sports has been made applicable to all recipients of federal education

numbers substantially proportionate to their respective enrollments;

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

3. Where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

Policy Interpretation, 44 Fed.Reg. 71,418.

### A. Substantially Proportionate

■ Plaintiffs argue that the undisputed facts demonstrate that under the first prong of the test, the District does not provide girls with athletic opportunities that are substantially proportionate to their enrollment at CPHS during the class period.[5] Girls enrollment and their participation in athletic activities are provided by plaintiffs as Tables 1 and 2, and Table 3 shows the difference between girls' enrollment percentage and percentage of girls participating in sports and the number of additional girls who would have played sports if participation were proportional to enrollment and no fewer boys participated in sports. Plaintiffs prepared the Tables from information obtained from defendants in response to various discovery requests and from the California Department of Education website. (*See* Kristen Decl. *passim.*). Defendants do not challenge the accuracy of these numbers.[6] Tables 1 through 3 follow:

### TABLE 1: ENROLLMENT AT CASTLE PARK BY GENDER

| Year | Girls | Percentage Girls | Boys | Percentage Boys | Total |
|------|-------|------------------|------|-----------------|-------|
| 2007–08 | 975 | 45.4% | 1173 | 54.6% | 2148 |

funds, including high schools and is applicable to interscholastic high school sports as well as intercollegiate sports. *See* 34 C.F.R. § 106.11. Defendants do not dispute that Title IX is applicable here.

5. As plaintiffs note, the time frame for the class dates to April 2005 based on the applicable two-year statute of limitations. (Plts' Mtn. Ps & As at 2 fn. 3.) However, plaintiffs have provided statistical information for prior years and defendants have not challenged consideration of this longer-range information.

6. Defendants do not challenge specifically the numbers provided in the tables prepared by plaintiffs; however, defendants object to certain evidence submitted by plaintiffs. Objected to evidence includes the deposition testimony of Maria Castilleja concerning softball; evidence related to purported interest in girls' flag/Powder Puff football; evidence showing that girls' tennis was not offered in prior years to the extent that it is intended to prove that girls' tennis will not be offered during the 2008–09 school year; evidence concerning the Clubs of Troy to the extent it is offered to show there are identified needs of female athletes that have not been met at CPHS; evidence concerning the lack of written process to assess current or future students' interests and evidence showing that girls' water polo was not offered in prior years to the extent that it is intended to prove that girls' water polo will not be offered during the 2008–09 school year. (*See* Defendants' objections, doc. no. 75–7.)

| | | | | | |
|---|---|---|---|---|---|
| 2006–07 | 1092 | 46.7% | 1246 | 53.3% | 2338 |
| 2005–06 | 1092 | 46.7% | 1246 | 53.3% | 2338 |
| 2004–05 | 1128 | 46.6% | 1292 | 53.4% | 2420 |
| 2003–04 | 1119 | 46.9% | 1268 | 53.1% | 2387 |
| 2002–03 | 1098 | 47.8% | 1201 | 52.2% | 2299 |
| 2001–02 | 1133 | 49.0% | 1178 | 51.0% | 2311 |
| 2000–01 | 1087 | 49.1% | 1128 | 50.9% | 2215 |
| 1999–00 | 1115 | 49.6% | 1132 | 50.4% | 2247 |
| 1998–99 | 1083 | 48.4% | 1153 | 51.6% | 2236 |

TABLE 2: ATHLETIC PARTICIPATION AT CASTLE PARK BY GENDER

| Year | Girls | Percentage Girls | Boys | Percentage Boys | Total |
|---|---|---|---|---|---|
| 2007–08 | 149 | 38.7% | 236 | 61.3% | 385 |
| 2006–07 | 174 | 36.4% | 304 | 63.6% | 478 |
| 2005–06 | 146 | 40.0% | 221 | 60.0% | 367 |
| 2004–05 | 172 | 33.4% | 343 | 66.6% | 515 |
| 2003–04 | 144 | 33.5% | 286 | 66.5% | 430 |
| 2002–03 | 198 | 40.8% | 287 | 59.2% | 485 |
| 2001–02 | 161 | 38.8% | 254 | 61.2% | 415 |
| 2000–01 | 163 | 35.3% | 298 | 64.6% | 461 |
| 1999–00 | 144 | 36.6% | 249 | 63.4% | 393 |
| 1998–99 | 156 | 34.0% | 303 | 66.0% | 459 |

TABLE 3: DIFFERENCE BETWEEN GIRLS' ENROLLMENT AND PARTICIPATION, AND NUMBER OF GIRLS WHO WOULD BE PARTICIPATING IF PARTICIPATION WERE PROPORTIONAL TO ENROLLMENT

| YEAR | Difference Between Girls' Enrollment Percentage and Percentage of Girls Participating in Sports | Additional Girls Who Would Have Played Sports If Participation Were Proportional To Enrollment and No Fewer Boys Participated |
|---|---|---|
| 2007–08 | – 6.7 | 47 |
| 2006–07 | –10.3 | 92 |
| 2005–06 | – 6.7 | 48 |
| 2004–05 | –13.2 | 127 |
| 2003–04 | –13.4 | 108 |
| 2002–03 | – 7.0 | 65 |
| 2001–02 | –10.2 | 83 |
| 2000–01 | –13.8 | 124 |
| 1999–00 | –13.0 | 101 |
| 1998–99 | –14.4 | 128 |

For the relevant class-period years, the percentage differences between female enrollment and female participation in sports were 6.7%, 10.3% and 6.7%. (*See* Table 3.) Defendants contend that despite the obvious disparity between the female enrollment and the female athletic participation figures, the percentages are substantially proportionate. Defendants cite to several cases where courts found that certain disparities were sufficiently large to show non-compliance but in each of these cases, the percentages "were at least 10.5%." (Opp. at 5.) A 10.5 percentage does not provide a benchmark as defendants suggest. There is no set ratio that constitutes

"substantially proportionate" or that, when not met, results in a disparity or a violation. Rather, substantial proportionality requires a close relationship between athletic participation and enrollment.

■ When looking at the 2007–08 school year, girls comprised 45.4% of the school population but only 38.7% of athletic participants. This 6.7% difference does not show a close relationship between female athletic participation and enrollment. Instead, this particular disparity is not substantially proportionate because the 6.7% difference reflects 47 girls who would have played sports if athletic participation was proportional to female enrollment.

The Policy Interpretation states that:

Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it must do so for members of the other sex under the following circumstances:

. . .

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team. . . .

44 Fed.Reg. 71,418.

Forty-seven females could sustain at least one viable competitive team and likely several competitive teams. The 2005–06 and 2006–07 figures show an even greater disparity between female enrollment and participation when considering the additional number of girls who would have played sports if participation were substantially proportionate to enrollment. (*See* Table 3.)

The Court must conclude, as a matter of law, that plaintiffs have demonstrated that defendants fail to provide female students with opportunities to participate in athletics in substantially proportionate numbers as males. But the District's failure to meet substantial proportionality at CPHS does not preclude it from complying with Title IX in either of the other two approved methods.

**B. Program Expansion for Girls**

■ As the Court has found here, when an institution fails to achieve substantial proportionality, compliance may be found under the second prong of the test if the "institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex." 44 Fed.Reg. 71,-418; *see also Boucher v. Syracuse University,* 164 F.3d 113, 117 (2d Cir.1999)(courts look to the institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion).

■ Defendants argue that the number and variety of athletic teams available at CPHS has increased since 1998–99 thereby demonstrating that the athletic programs for girls has expanded. In support of their contention, defendants also point to the fact that CPHS currently has more athletic sports teams for girls (23) than it does for boys (21). But as plaintiffs correctly note, the number of teams offered to girls is not the ultimate issue. For example, a single team may support nine athletes or 30 athletes. Three teams of nine females provide fewer athletic opportunities than one team of 30 males. The number of teams available for female participation standing alone is not conclusive under this prong of the Title IX compliance test. Whether there has been continuing program expansion for girls is determined by looking at the actual number and the percentage of females participating in athletics.

■ Table 2 shows that the percentage of girls participating in athletics at CPHS ranges from a 2004–05 low of 33.4% to a

2003–04 high of 40.8% with the 2007–08 school year having a 38.7% female participate rate. The undisputed data shows that female athletic participation at CPHS is not continuing to expand. Although a slight decrease in athletic participation in a given year will not be fatal to showing compliance with Title IX, when, as here, there is no steady increase in female participation, defendants are not entitled to show compliance with Title IX based on a history and continuing practice of program expansion.

## C. Accommodation of Girls' Interest

■ A school "which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." *Cohen v. Brown University*, 991 F.2d 888, 897–98 (1st Cir.1993)(*Cohen I*); accord *Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 829 (10th Cir. 1993). If the plaintiffs prove disparity, as they have here, then the school must show that it has a history and continuing practice of program expansion under the second prong of the test. Because the Court finds that the school has not met the second prong, plaintiffs may prevail by sustaining their burden of proof under the third prong demonstrating an unmet interest on the part of the underrepresented sex. *Roberts*, 998 F.2d at 830–31; *Cohen I*, 991 F.2d at 901. The third prong

> 'sets a high standard: it demands not merely some accommodation, but full and effective accommodation.[7] If there is sufficient interest and ability among

members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.'

*Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir.1994)(quoting *Roberts*, 998 F.2d at 831–32 (quoting *Cohen I*, 991 F.2d at 898)).

■ Contending that the interests of female athletes are fully and effectively accommodated at CPHS, defendants assert plaintiffs have failed to provide evidence that specific girls or groups of girls have the necessary interest and ability to field a competitive, approved interscholastic sports team.[8] (Opp. at 19.)

■ Plaintiffs first note that defendants have not sought to determine the athletic interests and abilities of their students through a formal written process. "With respect to the manner in which the interest of the students is to be determined, the Policy Interpretation instructs that the methods chosen by the institution must be nondiscriminatory and must not disadvantage members of an underrepresented sex." *Horner*, 43 F.3d at 273 (citing Policy Interpretation, 44 Fed.Reg. at 71,417). But a specific survey or assessment of interests and abilities is not required by the Title IX regulation or the Policy Interpretation, *see Cohen v. Brown*, 101 F.3d 155, 180 (1st Cir.1996) ("*Cohen IV*"), even though they may be required as part of a remedy when OCR has concluded that an institution's current program does not equally effectively accommodate the interests and abilities of

---

**7.** Although "the institution's burden under subsection (3) is an exacting one, an institution is not required to field a team in response to, *e.g.*, the pleas of 'one talented softball player,' if sufficient numbers of individuals to form teams to compete do not exist." *Horner*, 43 F.3d at 275 fn. 9 (citing *Roberts*, 998 F.2d at 831 n. 10; *Cohen*, 991 F.2d at 898).

**8.** Defendants attempt to limit the unmet interest and ability prong of the three-part test to an approved California Interscholastic Federation ("CIF") sport in CPHS's interscholastic conference. (Opp. at 19.) However, there is no evidence submitted that CIF approval is a necessary prerequisite for a school to determine or act on athletic interest and abilities.

students. *See* Investigator's Manual at 27; *Cohen III v. Brown University,* 879 F.Supp. 185, 210 n. 51 (D.R.I.1995). However, the expressed interests of girls and "other programs indicative of interests and abilities, such as club and intramural sports, sports programs at 'feeder' schools, community and regional sports programs and physical education classes" may provide a basis for assessing unmet interest and ability.

Although defendants have not surveyed their students,[9] plaintiffs have provided evidence to show unmet interest coupled with the ability of female students to participate in interscholastic athletics at CPHS.

### 1. Field Hockey

Plaintiffs point to field hockey as a viable sport that has been discontinued to demonstrate unmet interest. A review of the history of female participation shows that a significant number of girls at CPHS have an ability to competitively participate in this sport. CPHS has had female field hockey teams over the course of the past ten years; however, the sport was eliminated twice during the class period.

Table 4: Girls Playing Field Hockey at CPHS

| Year | Girls Field Hockey Participants |
|---|---|
| 2007–08 | not offered |
| 2006–07 | 9; no competition secured |
| 2005–06 | not offered |
| 2004–05 | 16 |
| 2003–04 | 25 |
| 2002–03 | 23 |
| 2001–02 | 16 |
| 2000–01 | not offered |
| 1999–00 | not offered |

9. Defendants provide an after-school program, the Clubs of Troy, that provides opportunities for students to "get together to participate in various friendly activities." (Opp. at 11). Defendants acknowledge that some of the activities are "physical in nature." *Id.* The Clubs of Troy conducted an interest survey defendants contend was "not concerned

Defendants provide no evidence that interest in field hockey waned in 2005–06 or 2007–08, but rather explain that a coach was not available for a team. (*See* Kristen Decl. ¶ 22.) Whether defendants are unsuccessful at obtaining or maintaining a coach for a sport is not an indicator of lack of student interest or inability on the part of female students. In his deposition, Paul Van Nostrand, the Athletic Director of CPHS from 2001–05, stated that an unidentified number of girls approached him and expressed an interest in playing field hockey at CPHS during the years between 2001 and 2005. (Exh. G, Van Nostrand Dep. at 200–01.) Plaintiffs also provide the sworn statements of Naudia Rangel and Veronica Ollier, class representatives, concerning interest in field hockey during relevant time periods. (Exhs. P, Q, R.) Although asserting in its opposition that nine players are necessary to support a competitive field hockey team, defendants must acknowledge that the required number is a minimum seven and a maximum of 11 players. (*See* Opp. Exh. I.)

As the *Cohen IV* court noted, when a viable team is eliminated, unmet interest is strongly suggested. When coupled with admissible evidence of unmet interest, defendants must "go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (internal quotations omitted).

with hardcore interscholastic competition" and therefore the survey is not relevant to determining whether there is sufficient interest to field certain interscholastic teams." *Id.* Attempts to discern female students' interest is not limited to addressing "hardcore" sports.

Plaintiffs, as the moving party, have provided admissible evidence showing unmet interest and an ability to participate on the part of female students in field hockey at CPHS. Defendants have failed to provide admissible evidence to counter plaintiffs' proof. As a result, plaintiffs have proven that defendants have not met the third prong of the test in that they have failed to fully and effectively accommodate female athletes and potential female athletes at CPHS.

### 2. Other Sports

■ Plaintiffs also contend there is unmet interest on the part of female students with respect to tennis and water polo. In support of their position, plaintiffs point to several depositions that demonstrate that girls tennis has not been offered since 2004 or 2005 because there was no coach available. (Kristen Decl. Exh. F, Moore Depo at 34, 97, 238, 266; Weins Depo at 52, 53; Exh. G, MacGreggor Depo 476.) For the same reason, the lack of a coach, water polo was not offered at various times. Defendants, rather than addressing past years availability of these sports, contends both sports are being offered during the 2008–09 school year and that water polo was offered in 2005–06 and 2007–08. (Opp. at 16.) Rather than provide any evidence to counter plaintiffs' showing of interest by female students tennis and water polo, defendants argue a lack of coaching personnel and their good faith in attempting to obtain coaches to justify the elimination of teams during certain years. As discussed above, the issue is whether there is unmet need on the part of females; not whether coaches are available.

Plaintiffs have demonstrated with admissible evidence the interest and ability among females at CPHS. Defendants have failed to counter that proof. Consequently, defendants fail the third prong of the compliance test.

### IV. Conclusion

As a matter of law, the Court finds defendants have allowed significant gender-based disparity, *i.e.*, not substantially proportionate, with respect to female athletic opportunities; failed under prong two to show a history and continuing practice of expansion of opportunities for females; and failed under prong three to demonstrate that female interest and abilities have been fully and effective accommodated. Because plaintiffs have demonstrated through admissible evidence that defendants are not in compliance with Title IX based on unequal participation opportunities in athletic program, plaintiffs are entitled to summary judgment on their second cause of action.

Based on the foregoing, **IT IS ORDERED** plaintiffs' motion for partial summary judgment with respect to the second cause of action and certain affirmative defenses is **GRANTED**. The following affirmative defenses are dismissed with prejudice from this action: promissory estoppel, contribution and indemnity, failure to mitigate, statute of limitations, excuse, condition subsequent, good faith, act of God, failure to exhaust administrative remedies, complaint barred for failure to exhaust judicial remedies, deliberate indifference, general governmental immunity, exercise of discretion within scope of employment— Government Code § 820.2, failure to exhaust internal remedies, legitimate business purpose, business necessity, failure to comply with Tort Claims Act—Government Code § § 900 *et seq.*, immunity from negligent misrepresentation, eleventh amendment immunity, qualified immunity and reservation of additional affirmative defenses.

**IT IS FURTHER ORDERED** that the parties shall jointly contact Magistrate Judge McCurine's chambers for further

proceedings within five days of the filing of this Order.

**IT IS SO ORDERED.**