**Audra BEASLEY, individually and on behalf of all other similarly situated, Plaintiff,**

v.

**ALABAMA STATE UNIVERSITY, et al., Defendants.**

**Civil Action No. 96–T–473–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 9, 1997.

**1120**

Joseph (Jay) Brady Lewis, Montgomery, AL, Andy D. Birchfield, Jr., Beasley, Wilson, Allen, Main & Crow, Montgomery, AL, J.

Bernard Brannan, Jr., Brannan & Guy, Montgomery, AL, for plaintiff.

Solomon S. Seay, Jr., Montgomery, AL, Cynthia Williams Clinton, Mark Englehart, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for defendants.

### ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Audra Beasley, a female student and former athlete at defendant Alabama State University (ASU), filed this lawsuit on March 15, 1996, claiming that ASU, through its trustees and various officers, was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681 et seq., and its implementing regulations, 34 C.F.R. §§ 106.38, 106.41, as well as the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983. Beasley contended that she and a class of similarly-situated aspiring female athletes at ASU whom she sought to represent were being injured by ASU's failure to furnish scholarships and intercollegiate competitive opportunities and facilities to women on an equal basis with male athletes at ASU, or to accommodate the existing interest of female athletes at the University to participate in athletics. Beasley sought broad declaratory, injunctive, and monetary relief. On May 1, 1996, defendants moved to dismiss. On March 27, 1997, this court issued an order granting the motion to dismiss in part and denying it in part, ruling that ASU may be sued under Title IX, and that other individually-named, current officers of ASU may be sued in their official capacities for injunctive relief under Title IX and the fourteenth amendment. The court dismissed all other claims and defendants. The remaining defendants have now moved for reconsideration of the March 27 order, to the extent that it denied parts of the motion to dismiss. Defendants do not seek reconsideration of all grounds for dismissal argued in their motion to dismiss, but submit that the court failed to give proper consideration to three specific grounds asserted in that earlier motion: first, that Beasley's claims are time-barred; second, that she lacks standing to assert most of the claims advanced in her complaint, either on her *own* behalf or *on behalf* of a putative class, and that she now lacks

standing to seek injunctive relief with regard to any claim; and third, that punitive damages are not recoverable against ASU. Beasley has since conceded the third point.

Rather than rule on the remaining aspects of the motion to reconsider in summary fashion, the court will elaborate upon the structure of Title IX violations, as this structure lends a peculiar complexion to the issues of standing and time limitations for bringing a Title IX complaint. The court hopes that this clarification will provide guidance to the parties through the future course of this litigation.

## I. MOTION TO DISMISS STANDARD

In considering a defendant's motion to dismiss pursuant to Rule 12(b), the court accepts the plaintiff's factual allegations as true, *Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir.1994); *Andreu v. Sapp*, 919 F.2d 637, 639 (11th Cir.1990), and construes the complaint liberally in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The action may not be dismissed unless "it appears to a certainty," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), that the plaintiff can offer no set of facts supporting the relief requested. *Scheuer, supra; Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir.1993).

## II. BACKGROUND

The facts presented by Beasley are as follows.[1] Beasley is a female student and skilled athlete who was recruited to attend and play volleyball at ASU by its volleyball coach, with the promise of an athletic scholarship. She enrolled at ASU and played volleyball in the fall of 1991, her first semester, but was then told she would not receive the promised scholarship because of a lack of funds allocated by ASU for women's volley-

ball. Had funds for women's sports at ASU been allocated on a gender-equitable basis, Beasley believes, she would have qualified for and received the promised scholarship.

Even without a scholarship, Beasley continued to play on the women's team in the fall of 1991, but suffered a foot injury during an intercollegiate volleyball match that October, which injury was serious enough to require surgery. ASU continually refused to provide financial coverage for the surgery until December 1995, when it relented and paid for Beasley to have surgery. Male athletes who suffer comparable injuries are said by Beasley to receive relatively prompt treatment and financial support. Beasley, at times, and without much detail, also refers to other disparities in treatment she has experienced as a female athlete at ASU, including provision of practice facilities and coaching.

Beasley further claims that ASU fails to provide equal opportunities for women to participate in varsity college athletics, and fails to accommodate the desires and abilities of its women athletes to participate in varsity college athletics. Until her NCAA eligibility expired in 1996, Beasley continued to have interest in participating in varsity volleyball or other athletic programs at ASU.

## III. DISCUSSION

### A. The Structure of Title IX Claims

Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a). The Department of Education (DED), through its Office of Civil Rights (OCR), pursuant to Title IX's statutory delegation,[2] issued[3] and now administers

---

**1.** This factual summary includes details first provided in Beasley's response, filed on May 5, 1997, to defendants' motion to reconsider.

**2.** The DED "shall prepare and publish ... regulations implementing the provisions of Title IX ..." Javits Amendment, Pub.L.No. 93–880, § 844, 88 Stat. 612 (1974). Regulations were approved by President Ford in 1975, pursuant to the requirements of 20 U.S.C.A. § 1682.

**3.** Pursuant to the congressional grant of authority, the Secretary of Health, Education, and Welfare ("HEW") promulgated the regulations under Title IX. In 1979, after HEW was split, the DED adopted the HEW regulations verbatim, and the DED currently continues to administer the athletic programs provisions of the regulations. *See Cohen v. Brown University*, 991 F.2d 888, 895 (1st Cir.1993) ("*Cohen II*"), for fuller discussion

regulations implementing Title IX, including rules governing athletic scholarships, 34 C.F.R. § 106.37(c), and participation in collegiate athletics, 34 C.F.R. § 106.41.

The DED has also promulgated an official Policy Interpretation to guide the OCR's enforcement of Title IX in intercollegiate athletics. 44 Fed.Reg. 71413–23. The court defers substantially to an agency's interpretation of its own regulations, *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991), particularly when such regulations have been issued pursuant to a statutory delegation. *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir.) (Title IX athletics action), *aff'g Roberts v. Colorado State Univ.*, 814 F.Supp. 1507 (D.Colo.), *cert. denied*, 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993).

■ The regulations and Policy Interpretation diagram three separate areas in which compliance, or failure to comply, with Title IX may be discerned: availability of athletic financial assistance or scholarships, *see* 34 C.F.R. § 106.37(c), and 44 Fed.Reg. at 71415; equivalent treatment with regard to athletic benefits and opportunities, *see* 34 C.F.R. § 106.41(c)(2)–(10), and 44 Fed.Reg. at 71415–17; and effective accommodation of current student abilities and interest in athletic participation. *See* 34 C.F.R. § 106.41(c)(1), and 44 Fed.Reg. at 71417–18. Following the approach of other courts, the court regards divergence from the nondiscrimination mandate in any one of these areas as constituting a separate and distinct type of claim, to be analyzed separately. *See, e.g., Cohen v. Brown University*, 991 F.2d 888, 897 & n. 11 (1st Cir.1993); *Bryant v. Colgate University*, 1996 WL 328446, CV–93–1029 (N.D.N.Y. June 11, 1996) at *3 ("The [policy interpretation] reasonably separates the regulations into three categories of athletics claims under Title IX."); *Boucher v. Syracuse University*, 1996 WL 328441, CV–95–620 (N.D.N.Y. June 12, 1996) at *1.

i. *athletic scholarships*

As a recipient of federal funds for education, ASU is required to "provide reason-able opportunities for [scholarship or grant] awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics." 34 C.F.R. § 106.37(c)(1). DED understands from this regulation that compliance should be determined by "whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs," 44 Fed. Reg. at 71415, as measured by "dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results." *Id.* If this comparison results in a finding of "substantial" equality, or a disparity that "can be explained by . . . legitimate, nondiscriminatory factors," compliance will be found. *Id.*

■ For purposes of this claim, unlike effective accommodation (see below), it is irrelevant what the overall participation rates of men and women in ASU's athletic programs are, relative to their enrollment. What matters is simply whether "the total amounts of scholarship aid made available to men and women [are] substantially proportionate to their participation rates." *Id.* The actual number or dollar value of individual scholarships made available to men and women is not directly compared.

Beasley specifically alleges that she failed to receive a promised athletic scholarship to play volleyball because of a lack of funds allocated for women's volleyball. Pl.'s Compl. at ¶ 6. Indeed, the complaint asserts that "Women students are denied an equal opportunity to compete for and to receive athletic scholarships. . . . Scholarships are also unequally distributed [between the sexes]." Pl.'s Compl. at ¶¶ 31, 33. Strictly speaking, what Beasley must allege is that male athletes at ASU, overall, receive dollar amounts of scholarship support, *relative to their actual participation level in athletics,* greater than women receive, or that male volleyball players in positions equivalent to her own receive disproportionately greater scholarship support. *See* Policy Interpretation at 74417–18 (Title IX can be violated

of the history of the regulations and policy inter-    pretation.

*either* by substantial gender disparities in an institution's athletic programs as a whole, or by disparities in *individual segments* of the program with respect to benefits, treatments, services or opportunities which are substantial enough in and of themselves to deny equality of athletic opportunity).

Although Beasley's references to 'inequality' and 'discrimination' do not couch her claim in the language of the regulations, there is no need to be overly formalistic about this under liberal pleading standards. Those terms could well be understood to encompass a Title IX scholarship claim. Having plead an institutional violation of Title IX in this area, Beasley must, of course, show that she herself suffered injury as a direct result of this discriminatory scholarship support for men and women athletes. That is the point at which standing must be scrutinized.

ii. *equivalent treatment*

Section 106.41(c) of the Title IX implementing regulations has become virtually uniformly understood, as a result of the Policy Interpretation, and the reasoned opinions of courts of many federal circuits, to encompass two additional and distinct areas for measuring compliance with the 'equality of athletic opportunity' mandate. *See Cohen II,* 991 F.2d at 897; *Roberts v. Colorado State,* 814 F.Supp. at 1510–11; *Pederson v. Louisiana State Univ.,* 912 F.Supp. 892, 909 (M.D.La.1996). The first, in subsection (1), constitutes effective accommodation, which will be discussed below in subpart iii. The other nine subsections, (2)–(10) inclusive, are factors by which equal treatment in providing athletic opportunities to male and female athletes is measured. Without reciting the entire regulation, suffice it to say that such factors include, *inter alia,* provision of equipment, training facilities, coaching, and medical facilities and services. 34 C.F.R. § 106.41(c). The Policy Interpretation declares that compliance with this mandate for equal treatment in the provision of athletic

opportunities should be assessed by comparing the quality and kinds of benefits and opportunities afforded members of both sexes. 44 Fed.Reg. at 71415 ¶ VII.B.2. More specifically, the provision of medical facilities and services is assessed by looking at "the equivalence, for men and women athletes, of: (1) Availability of medical personnel and assistance; [and] (2) Health, accident and injury insurance coverage." 44 Fed.Reg. at 71417 ¶ VII.B.3.g.

Beasley clearly alleges that ASU refused for several years to pay for medical treatment of her foot injury, incurred during an intercollegiate athletic competition as a member of an ASU varsity team, because of disparate treatment and provision of medical services for male and female athletes at ASU. Pl.'s Compl. at ¶ 6. Again, ultimately, Beasley must link her disparate medical treatment claim, which is premised upon the relative services male and female athletes generally receive, be they athletes at ASU in general, varsity athletes, or varsity volleyball players, with her own injury. For example, male athletes suffering injuries in competition could be shown to receive prompter attention than women do, and Beasley did. But such weighing of the evidence and showing of causation is more appropriate material for summary judgment or trial.

The court is also cognizant of the dearth of case law on equivalent treatment claims in athletics under Title IX, *see, e.g., Cohen v. Brown University ("Cohen III"),* 879 F.Supp. 185, 212–13 (D.R.I.1995) (two-tier structure for men and women constitutes equal treatment violation, but school may achieve compliance at own discretion in a number of ways); *Bryant,* 1996 WL 328446 at \*5 (failing to find standing to raise disparate treatment claim where members of club sought to compare their treatment to that of male varsity team), which admittedly complicates Beasley's task. Certainly, however, a broad-based showing of disparate treatment is the first step.[4]

---

4. How narrowly a court should tailor a remedy to redress the personal injury a plaintiff suffers as a result of disparate treatment of male and female athletes institution-wide is a question di-

rectly bearing, as well, on that plaintiff's standing to represent a class of female plaintiffs at the institution. For example, once a showing of broad-based disparate treatment is demonstrat-

### iii. *effective accommodation*

The effective accommodation prong receives the briefest treatment in the regulations, and yet it is the most highly litigated, and thus well-settled area of law, of the three. It is "the heartland" of Title IX law in the field of athletics. *Cohen II*, 991 F.2d at 897.

To test equal opportunity to participate in athletic programs, the OCR should consider "whether the selection of sports and levels of competition effectively accommodate[s] the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). The Policy Interpretation is quite detailed and clear regarding what a plaintiff has the burden of alleging and ultimately proving for an ineffective accommodation claim. Factors looked at when assessing such a claim include: the athletic interests and abilities of students, the selection of sports offered, and the levels of competition made available.

■ When offering sports programs, an academic institution need not provide exactly the same choice of sports to men and women, though where a given sport is supported for members of one gender, if the opportunities for members of the other gender to participate in that sport have been historically limited, and there is both sufficient interest and ability among the members of that excluded sex to sustain a viable team, and a reasonable expectation of intercollegiate competition for that team, the institution may be required to support such a team. Unfortunately, the court has been presented with precious little information regarding historical or present practice with regard to volleyball at ASU.

As for levels of competition made available, the policy statement lays out three factors to assess, which the courts have used to fashion a three-stage, burden shifting test of compliance. *See, e.g., Horner v. Kentucky High*

*School Athletic Ass'n,* 43 F.3d 265, 274 (6th Cir.1994).

■ First, are intercollegiate-level participation opportunities for male and female athletes provided in numbers substantially proportionate to their respective enrollments? If so, the institution will find itself nestled in the safe harbor of compliance with Title IX, regardless of which way, or how hard, the winds of the remaining two factors blow. *See Horner,* 43 F.3d at 275; *Roberts,* 998 F.2d at 829; *Cohen,* 991 F.2d at 897–98. *But see Pederson* 912 F.Supp. at 913 (no safe harbor). The test of such substantial proportionality is, however, stringent. *See Roberts,* 998 F.2d at 829 (10.5% disparity not substantial proportionality); *Cohen v. Brown University,* 809 F.Supp. 978, 991 (D.R.I.1992) (11.6% disparity not substantially proportionate); *Bryant,* 1996 WL 328446 at * 9 (13.2% disparity is prima facie disproportionate).

Next, failing compliance with the first factor, can the institution show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the under-represented sex? This factor can also be rather stringently deployed. *See Roberts,* 998 F.2d at 830 (history of expansion, but not sufficiently recent or continuing to satisfy the test). The factual burden here is on the institution itself, *Horner,* 43 F.3d at 275, and is thus not of concern in a motion to dismiss.

■ Finally, failing compliance with both those factors, does the institution effectively accommodate existing interests and abilities of members of the under-represented gender? Here again, courts have concluded, the burden is better placed on the plaintiff to show interests and abilities that remain unaccommodated by programs currently offered. *Cohen II*, 991 F.2d at 901. At this stage, the

ed, may a plaintiff denied equivalent medical care sue also on behalf of women denied equal access to practice facilities, or coaching? It would be an extremely odd result, indeed, if the personal injuries suffered through disparate treatment had to be defined so narrowly that, despite being based upon and driven by class discrimination, they would not be susceptible to class-wide treatment, and thus amenable to class-wide remedies. Defendants take just such

a position in their interpretation of the application of *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), and *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987), to disparate treatment claims under Title IX. Other than to note this peculiar result, the court will comment no further on this issue here, since it has not yet ruled on class certification.

institution is required to accommodate *fully* the unmet, demonstrated interest of the under-represented gender, and may not merely fail to accommodate fully the interests of male and female athletes in roughly proportional ways. *Cohen II,* 991 F.2d at 899; *Horner,* 43 F.3d at 275 n. 9. The institution may yet be excused, at least provisionally, if there is a shortage of available competition within its normal competitive region. *Roberts,* 998 F.2d at 831.

■ The complaint well states ASU's shortcomings with regard to the first part of this effective accommodation test, pleading a 32% disparity between athletic participation and enrollment levels for women. Beasley also alleges that ASU "does not provide enough varsity intercollegiate sports to accommodate the desires and abilities to participate of its women students to the same extent that it accommodates the desires and abilities to participate of its male students." Pl.'s Compl. at ¶ 30. Later, Beasley says that "Notwithstanding the demonstrated desire of female students such as [Beasley] .... to participate in varsity intercollegiate athletic competition, ASU's athletic program includes a disproportionate number of male students in its intercollegiate NCAA sports program as compared to female participants." *Id.* at ¶ 31. Allegations of *disproportionate* accommodation necessarily encompass allegations of *less than full* accommodation of interest of the under-represented gender. Therefore, Beasley adequately states a Title IX accommodation claim in the abstract; the question remains whether she states a claim in the specific, that is, with regard to a sport in

which she and others like her have sought to participate on a varsity level, but ASU failed to field a team.[5]

## B. Standing

### i. *the individual and the collective*

■ The foregoing analysis leads to an important conclusion about Title IX in the field of athletics. Title IX, while on its face a prohibition against individual discrimination in intercollegiate athletics ("no *person* shall be deprived"), proceeds according to an impact-based model of discrimination that is at least preliminarily, and perhaps inherently, group-focused or class-wide. That is why there is "little guidance for the method to use in concluding whether there is a violation of Title IX," *Cook v. Colgate Univ.,* 802 F.Supp. 737, 742 (N.D.N.Y.1992),[6] *vacated on other ground,* 992 F.2d 17 (2d Cir.1993), and why it is then so important to weave a careful path between the individual and the collective when considering the injuries, the causes of action, and the remedies in a Title IX action.

■ Only when the institution, in a broad-spectrum inquiry, is first found to be in violation of Title IX in one of the respects earlier outlined, does the question of individual or group causes-of-action for relief properly arise. Certainly some form of class discrimination must be asserted as a prerequisite to Beasley's claims, because each of them, it turns out, for Title IX purposes, hinges on how women athletes as a class, whether more narrowly or more broadly defined, have been treated relative to male athletes.[7] To the extent Beasley can present

---

5. In her affidavit, attached as Ex. A to her response to defendants' motion for reconsideration, Beasley states that, "During the time [she] has been enrolled as a student at ASU [she has] sought to participate and [has] been deterred from participating in varsity intercollegiate athletics funded by ASU." It is unclear whether this deterrence is supposed to go beyond the failure to give her a scholarship and attend to her medical needs.

6. Another court put this point more forcefully: "This court has found precious little guidance within the available jurisprudence to aid in understanding the analytical framework within which to address the claims in this case." *Pederson,* 912 F.Supp. at 911.

7. Courts have often looked at funding, treatment or accommodation on a team-by-team basis, which straddles the line between the individual and the collective. "The statute and regulations, however, invite a comparison between separate teams in a particular sport because they are designed to protect not only a particular class of persons, but individuals as well.... Any other conclusion would ignore the broad remedial purposes of Title IX." *Cook,* 802 F.Supp. at 742 & n. 4 (citing *Grove City College v. Bell,* 465 U.S. 555, 583, 104 S.Ct. 1211, 1226, 79 L.Ed.2d 516 (1984) (Brennan, J., dissenting in part)).

some larger set of facts about athletics at ASU that, if true, would tend to support her medical treatment, training facilities, coaching, scholarship, or accommodation claims, her constitutional standing to assert personal claims for such injuries should be supportable *a fortiori*.

The requisite elements to a showing of constitutional standing are, of course, personal injury of a concrete, and actual or imminent nature; traceability of such injury to the complained-of conduct of the defendant; and likelihood that a favorable decision by the court would redress that injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Jacobs v. Florida Bar*, 50 F.3d 901, 904 (11th Cir.1995).

Beasley complains specifically of injuries personally suffered through withdrawal of a scholarship offer from her and through discriminatory withholding of medical treatment, while also alleging generally that she has been injured in some fashion by ASU's failure to accommodate the desires of women athletes to participate in varsity athletics. A generalized grievance about how women athletes at ASU are treated does not, of course, confer upon Beasley, as a woman athlete, standing to pursue either a class or an individual claim, *see O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), unless accompanied by indicia of her own personal injury and its direct connection to that class treatment.[8] *See Pederson*, 912 F.Supp. at 902. Beasley has no generalized right to see that ASU follows the law.

■ As mentioned earlier in the discussion of the scholarship claim, Title IX directly affords Beasley no individual right to a scholarship, so her standing to assert a claim here must hinge on overall disproportionate provision of support funds to athletes of each gender, and on whether she can show a relationship of causation from that overall funding disparity to the asserted withdrawal of promised financial support from her.

■ With regard to the various equivalent treatment claims, the fate of an individual's standing to assert claims under Title IX is again intimately tied to the fates of her fellows—no individual has a right to treatment equal to that afforded any other particular individual of the other gender; rather, overall treatment of members of both genders must be compared, and thus any injury an individual suffers by virtue of disparate treatment naturally accrues through membership in the class or group of students of the gender discriminated against in that manner.

Likewise, no individual has a personal right under Title IX to participate in a particular sport with university support unless the collective criteria for an accommodation claim are met: in Beasley's case, there must be sufficient unmet interest and ability to support a volleyball team, a historical imbalance of access to that sport for men and women, a reasonable expectation of competition from other schools in ASU's usual competitive region, and so forth. *See Cohen II*, 991 F.2d at 898; *Cohen III*, 879 F.Supp. at 208 (no requirement to accommodate each and every expressed student interest—equal opportunities to class sufficient even if some individuals remain disappointed); *id.* at 198 (the Policy Interpretation "does not require a school to sponsor a women's team for every men's team offered and vice versa"); *Roberts*, 998 F.2d at 831 n. 10 (an institution is not required to field a team in response to pleas of a few players if sufficient numbers of players to compete do not exist); *Horner*, 43 F.3d at 275 n. 9.[9] Whether or not Beasley can properly assert standing to state an ac-

---

8. It may be possible to demonstrate that different injuries result from a commonly applied, biased policy or procedure, *see Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15; *Johnson v. Montgomery County Sheriff's Dep't.*, 99 F.R.D. 562, 565 (M.D.Ala.1983), or even from the practices of specific individuals with a discriminatory agenda, *Falcon*, 457 U.S. at 162 n. *, 102 S.Ct. at 2373 n. * (Burger, J., concurring), and thereby make a generalized treatment claim.

9. It is relatively easier to make out a case for nonaccommodation where a competitive team has been funded and then support has later been withdrawn, because the factual showing of interest in participation in that sport by skilled athletes is straightforward. *See Cohen II*, 991 F.2d at 904.

commodation claim requires further development of the facts surrounding general allegations that ASU does not properly fund or support women's volleyball.

### ii. *scope of claims*

■ The standing doctrine also limits the scope of claims which a given plaintiff may assert on behalf of a class. A plaintiff must establish a case or controversy between herself, personally, and defendants for each claim she wishes to present. A plaintiff "who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which [s]he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982). As mentioned above, the question of what constitutes a distinct claim under Title IX for scholarships, for equal treatment, and for accommodation is not entirely settled. Standing to present one sort of accommodation claim, for instance, will not necessarily confer upon a plaintiff standing to assert a similar, but distinct claim within the same general area. For example, a plaintiff deprived of the opportunity to play varsity softball, when interest and ability to field a competitive team exists, will not necessarily have standing to assert a claim on behalf of swimmers whose varsity status has been stripped. On the other hand, if every factor that contributes to a showing of disparate treatment were to define a separate and distinct claim, the broad sweep of Title IX would be displaced by the minutiae of highly personalized injury claims, and the availability of class remedies for institutional violations would be severely compromised.[10] The court merely poses the dilemma at this point, without yet having facts before it to decide concretely.

### iii. *injunctive relief*

■ Defendants also argue that, at this point, Beasley is disqualified from seeking injunctive relief with regard to any of her claims because her athletic eligibility has expired, and she cannot personally benefit in any way from such relief.

There is no question that, if her claims are valid, Beasley could have benefitted from injunctive relief at the time she brought suit, and certainly many of the class members she then sought to represent would still benefit from such relief now. The mere protractedness of this lawsuit should not vitiate the named plaintiff's capacity to vindicate the broad remedial purpose of Title IX. Defendant institutions should not be encouraged to engage in foot-dragging to stave off injunctive remedies. In any event, in situations of inherently transient standing like this one, leeway is given based on the great likelihood that any given plaintiff's claims will be mooted before the action is completed.[11] In broad institutional cases, the court will often not "have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479 (1980). But the fact "that the class was not certified until after the named plaintiffs' claims had become moot does not deprive [the court] of jurisdiction." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991). "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Id.* Most importantly, in contrast with cases like *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), a decision rendered by the court would affirmatively impact the welfare of other would-be plaintiffs, and would not be futile.

### C. Statute of Limitations

In their motion to reconsider, defendants raise as another specific ground the bar of the applicable statute of limitations.

■ Like many other federal statutes, Title IX does not have its own statute of limitations. Therefore, the court must apply "the most appropriate or analogous state

---

10. *See supra* note 4.

11. The most common situation is in cases dealing with pretrial detainees. *Gerstein v. Pugh*, 420

U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975); *Bell v. Wolfish*, 441 U.S. 520, 527, 99 S.Ct. 1861, 1868, 60 L.Ed.2d 447 (1979).

statute of limitations." *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987). It is now well settled that Title IX claims, like actions under § 1983 and other civil rights statutes, are subject to the limitations periods for personal injury actions under state law. *Egerdahl v. Hibbing Community College,* 72 F.3d 615, 617 (8th Cir.1995); *see also Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 729 (6th Cir.1996); *Cetin v. Purdue Univ.,* Nos. 94–3112, 95–1254, 1996 WL 453229 (7th Cir. Aug. 7, 1996) (unpublished opinion); *Bougher v. University of Pittsburgh,* 882 F.2d 74, 77–78 (3d Cir.1989). The proper period is that of the state's general or residual statute of limitations for personal injury actions, not any period that may relate to a more particularized tort. *See Lufkin v. McCallum,* 956 F.2d 1104, 1105 (11th Cir.1992); *Nelson v. University of Maine System,* 914 F.Supp. 643, 648–49 (D.Me.1996).

■ While it is clear that state law informs as to the applicable limitations period, "federal law determines when a cause of action accrues. Under federal law, a cause of action accrues the moment the plaintiff knows or has reason to know of the injury that is the basis of [the] complaint." *Helton v. Clements,* 832 F.2d 332, 335 (5th Cir.1987); *see also Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 (1st Cir.1995); *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir. 1987); *Rubin v. O'Koren,* 644 F.2d 1023 (5th Cir. 1981).[12]

■ On the other hand, state rules should be used to determine any applicable tolling periods to the running of a statute of limitations, so long as such rules are not inconsistent with the remedial policies underlying the federal statute. *Rubin,* 644 F.2d at 1025 (under Alabama law, pursuit of administrative grievance tolls running of statute in federal civil rights action).

Thus, to determine whether Beasley's claims are time-barred by the applicable statute of limitations, the court will address three questions: First, what is the relevant limitations period in Alabama? Second, when did Beasley's claim accrue and thus set the statute running? Third, do any state law tolling provisions apply?

#### i. *relevant limitations period*

■ Section 6–2–38(*l*) of the 1975 Alabama Code covers actions for any injury to the person or to personal rights not covered by another section of the Code, and applies to most types of tort actions. It allows two years from the date of accrual of the cause of action to file a claim. Federal civil rights statutes fall under this two-year provision. *Lufkin,* 956 F.2d at 1105 n. 2. Title IX is, therefore, subject to the two-year statute of limitations of § 6–2–38(*l*).

#### ii. *accrual of claim*

■ When a defendant pleads the statute of limitations as a bar against suit, the burden falls upon plaintiff to prove the cause of action accrued within the applicable period. *Miller v. Chemstrand Corp.,* 331 F.2d 374 (5th Cir.1964). As a general matter, the statutory period for bringing a suit alleging injury due to violation of a federal civil rights statute begins to run from the time a cause of action accrues, that is, as soon as a party has suffered cognizable injury and thus is entitled to maintain an action thereon. *Helton,* 832 F.2d at 335.

■ Defendants argue that, accepting all Beasley's factual allegations as true, Beasley's injuries occurred when she was denied a scholarship on a gender-discriminatory basis and suffered an untreated injury while participating in a volleyball competition, both in the fall of 1991. Thus, her cause of action to bring suit for those injuries began to accrue at that time, and is now time-barred, since this suit was commenced in March of 1996, well over four years later.

Beasley responds that her complaint is "premised on the contention that ASU has denied and continues to deny women students at ASU an equal opportunity to participate in varsity intercollegiate athletics and

---

**12.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the benefits, including but not limited to, scholarships, facilities, medical care and treatment, and the opportunity to compete at the varsity intercollegiate level that must necessarily accompany an equal opportunity to participate," and that "ASU has not and does not provide enough varsity intercollegiate sports to accommodate the desires and abilities to participate of its women students...." Pl.'s Resp. Br. to Mot. to Dismiss, at 3. In her response to the motion to reconsider, Beasley further specifies that she sought from ASU, and did not receive, financial support for medical treatment of her ankle injury, until December 1995. Pl.'s Resp. to Defs.' Mot. to Reconsider, at Ex. A (affidavit of Audra Beasley).

Beasley's claims all fall under the continuing violation doctrine. The Fifth Circuit Court of Appeals, in *Perez v. Laredo Junior College*, 706 F.2d 731, 734 (5th Cir.1983), explained the theory of continuing accrual of a civil rights claim, in the employment discrimination context, in some detail:

> "Although state law governs the substantive limitation period, federal law determines when a civil rights action accrues and, therefore, when the statute of limitations begins to run. In deciding when the statute of limitations commences to run under Sections 1981 and 1983, we look to the Title VII cases. The determination 'requires us to identify precisely' when the deprivation forbidden by Section 1983 or the denial of equal benefit of the laws forbidden by Section 1981 occurred. We assume that the continuing violation theory is available to remedy employment practices and policies that operate to deny employees their protected rights if the offending practice continued to be enforced during the limitations period."

*Id.* at 733 (citation and footnotes omitted).[13]

Two different standards have emerged for discerning ongoing or continuing violations in federal civil rights actions: the 'series-of-related-acts' standard (also called the 'continual acts' standard), and the 'systematic policy of discrimination' standard.

The series-of-related-acts standard has been elaborated upon and endorsed by most circuits, *see, e.g., Berry v. Board of Supervisors*, 715 F.2d 971, 981 (5th Cir.1983), including the Eleventh Circuit Court of Appeals. *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir.1988) (accepting the *Berry* factors examining subject matter, frequency, and permanence of the alleged violation). The *Perez* court explained that "If the discrimination alleged ... does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation." 706 F.2d at 733. As stated by the Ninth Circuit, "A continuing violation is occasioned by continual unlawful acts." *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir.1981). In the context of continual unlawful acts, such acts must be directed against the individual plaintiff, and at least one event must fall within the limits period. *Berry*, 715 F.2d at 981. A continuing violation must be factually distinguished from a discrete act of discrimination having repercussions that last beyond its occurrence. *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir.1992). In other words, it requires a finding of continual unlawful acts and not "continual ill effects from an original violation." *Ward*, 650 F.2d at 1147.

First, the court finds that Beasley's scholarship and equivalent treatment claims are closely interwoven, because had Beasley received prompt medical coverage for her injury she would have been eligible and able to rejoin the varsity women's volleyball team throughout her period of NCAA eligibility, which did not expire until sometime in 1996, some months after she finally had surgery on her ankle paid for by ASU. Even while injured, Beasley attempted to participate in

13. Typical situations where an ongoing violation has been found to postpone the date of accrual from when the statutory period begins to run include: where some injury has occurred but the full nature and extent of the injury, and the causes of action it may give rise to, remain to be determined, *see, e.g., Lendo v. Garrett County Bd. of Educ.*, 820 F.2d 1365 (4th Cir.1987); where violations of rights continue until the date of termination from employment, thus accruing from that date, *see, e.g., Rubin*, 644 F.2d at 1025; and where plaintiff alleges a continuing denial of equal treatment, such as continually being paid on an unequal basis, *see, e.g., Perez*, 706 F.2d 731.

sports at ASU to the extent she was able—for example, trying out for track and field in 1992.

ASU has made no showing that the scholarship promised to Beasley would have expired at the end of her first semester, a dubious proposition at best. More likely, so long as she continued to participate and be qualified, Beasley would have remained eligible to receive the promised scholarship throughout her academic career. Thus the alleged violation was renewed or repeated on at least a semester-by-semester basis, factoring out the fact that Beasley could not play because of her untreated injury. The medical treatment claim itself remained live until December 1995, when Beasley had her operation paid for by ASU. Any other, closely-related equivalent treatment claims likewise continued to accrue throughout Beasley's period of athletic eligibility. Beasley's scholarship and equivalent treatment claims fit snugly within the confines of the continual acts standard. The court finds that all of the scholarship and equivalent treatment claims, which are interwoven, continued, because of the repeated denial of medical coverage, through December of 1995, well within the two-year period preceding Beasley's complaint.

▮ Second, to establish a continuing violation based on a systematic policy of discrimination, "[a] plaintiff must establish that the unconstitutional or illegal act was part of 'standard operating procedure,' a fixed and continuing practice.... [I]f the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute [of limitations] does not foreclose an action aimed at [ ]enforcement of the policy during the limitations period." *Perez,* 706 F.2d at 733–34 (footnotes omitted). This reasoning extends to Title IX actions as well. *See Grove City,* 465 U.S. at 566, 104 S.Ct. at 1218.

Beasley is claiming that her and her fellow female students' rights to participate in varsity intercollegiate athletics were violated in an ongoing, or continual, fashion throughout her period of eligibility, because of a pervasive policy at ASU to disfavor and direct insufficient attention, funds and resources to women's sports. In other words, Beasley is contending that her accommodation claim continued to accrue within the limitations period, because there has been an ongoing violation throughout the period of her athletic eligibility, and into the present.[14] Beasley alleges that any deprivation of opportunity to compete that she suffered resulted from a continuing, offensive practice or policy of the university, its "standard operating procedure." Thus, Beasley's claim satisfies the cautionary guideline that a "plaintiff may not circumvent the limitations period by merely labeling an act a continuing violation," *Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 591 F.Supp. 125, 134 (N.D.Ga.1984), but must instead "maintain that a pattern of discrimination [ ] presently exists to perpetuate the alleged wrong." *Id.* (internal citations omitted).

### iii.  *tolling law*

▮ Although the Alabama Code, and case law, suspends running of the statute of limitations in certain areas where the full extent of injury cannot be ascertained in the first instance, *see, e.g.,* 1975 Ala.Code § 6–2–30(b) (asbestos exposure); 1975 Ala.Code § 6–2–3 (fraud); *Continental Cas. Ins. Co. v. McDonald,* 567 So.2d 1208, 1216 (Ala.1990) (outrage tort "arise[s] from continuous dealings between the parties [and so] will not be barred until two years after the last tortious act by the defendant ... because of the continuing nature of the tort and the injury, because there [are] no severable claims for earlier injuries [where cumulative acts must cross threshold of outrageous conduct], and because the allegations were of an ongoing pattern of conduct"); *Garren v. Commercial Union Ins. Co.,* 340 So.2d 764 (Ala.1976) (date of injury is the last day on which plaintiff was exposed to danger in continuous exposure case); *Garrett v. Raytheon Co.,* 368 So.2d 516 (Ala.1979) (same for radiation ex-

---

**14.** Beasley further claims that these violations continue at present, which raises the question of her standing to represent a class of current aspiring athletes once her own eligibility has expired. This question need not be explored at this stage, where class certification issues have not been examined. *See supra* Part III.B.

posure), such suspension rules and statutes, even if they could be characterized as tolling provisions, *see Hardin v. Straub*, 490 U.S. 536, 539, 109 S.Ct. 1998, 2000, 104 L.Ed.2d 582 (1989),[15] do not apply directly to this case.

 There is some suggestion that Beasley sought remedial action from ASU officials themselves, and certainly from the OCR. As noted, under Alabama law, "pursuit of a[n] elective grievance procedure tolls the applicable statute of limitations" during the pendency of administrative proceedings, *Jefferson County v. Reach*, 368 So.2d 250, 252 (Ala.1978), and this is consistent with the policies underlying § 1983. *Rubin*, 644 F.2d at 1025. *See also Calhoun v. Federal Nat. Mortgage Assoc.*, 823 F.2d 451, 456 (11th Cir.1987)(recognizing validity of *Reach* tolling rule). Thus, even if Beasley's claims had not accrued within the statutory period, her filing of administrative complaints might well have tolled the running of the statute, preserving the timeliness of her claims in this action.[16]

## IV. CONCLUSION

Beasley brings claims under Title IX for discriminatory treatment of women at ASU with regard to scholarships, provision of medical treatment, training facilities and coaching, and opportunities to participate in varsity athletics, and has made at least a preliminary showing of personal injury she has suffered as a result of each of these practices. Moreover, according to her complaint, Beasley could and would have competed in her chosen sport of volleyball throughout her period of eligibility, but for these practices at ASU, such as the failure to pay for surgery for an injury she suffered as a varsity athlete early in her collegiate career. Thus, her injuries continued to accrue within the statutory limitations period. Beasley thus has standing, her claims are not untimely, and she is qualified to continue to seek

class certification, where appropriate to her claims, in order to obtain injunctive relief from ASU.

Accordingly, it is ORDERED that:

(1) Defendants' motion to reconsider, filed on April 11, 1997, is granted as to plaintiff's claim for punitive damages under Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681 et seq.

(2) The motion is denied in all other respects.

**15.** Since the length of the limitations period is interrelated with the applicable tolling policy, courts "should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue." *Id.* A state rule suspending running of the statute in a continuing tort context only fills out and supports

the federal policy, and thus should be considered alongside it.

**16.** The facts surrounding the OCR filing and investigation, and their timing, are not abundantly clear at this stage.